Good morning, gentlemen. The first case on this morning's docket is the case of in the Estate of Elvira Svoboda versus Donald Svoboda et al. And we have Brian Cowell for the appellant and William, is it John? John for the appellate and you may proceed when you're ready, Mr. Cowell. May it please the court, and good morning. My name is Brian Cowell. I'm an attorney in Edwardsville, Illinois at the law firm of Byron Carlson Petrie & Cowell. I'm here today representing the co-executives in this matter, Daniel Svoboda and Donald Svoboda. We're here today before the court on an appeal from a final order finding heirship from Madison County Circuit Court, the Honorable Judge Stephen Stobbs. By way of background, Vera Svoboda was a long-time resident of Edwardsville. Indeed, she worked at the Madison County Circuit Clerk's Office. She had four sons, Donald Svoboda, Daniel Svoboda, Dennis Svoboda, and David Svoboda. In 1984, Vera executed a will in which she left her estate in quarter increments to her four sons. In 1989, she executed a codicil to that will in which she changed the distribution so that Donald Svoboda would receive one-seventh and the remaining boys would receive two-sevenths. In 1996, David William Svoboda died pre-deceasing Vera Svoboda. On January 2nd, 2003, Vera Svoboda died. And immediately after, January 17th, 2003, her will was admitted into probate and my clients, Daniel Svoboda and Donald Svoboda, were named co-executives. At that time, January 17th, 2003, there was an affidavit of heirship filed with the court identifying the three surviving heirs, her sons, Daniel, Donald, and Dennis, and one other heir, her grandson, David Bolt Svoboda. So that David Svoboda, who died in 1996, left one known child, David Bolt Svoboda. So the heirship was filed with the court and the order was admitted to have the case proceed with independent administration. Vera had two primary assets in her estate, both being property, one being the farm where the boys were raised, which was sold in March 2003 for approximately $1.4 million. And the funds were distributed in April 2003. And the other main asset was Vera's home, which she was residing in on her death in Glen Carbon, which sold in August 2003. And the proceeds were used primarily to pay for taxes and expenses. Now, the petitioner in this case, Mr. Broshar, filed his petition to declare heirship in November 2004, nearly two years after the will was admitted into probate. The petitioner claimed and is pleading to be the biological son of David William Svoboda. Now, the petitioner never had contact with Vera Svoboda or any of the Svoboda boys prior to filing the petition. Now, as a procedural matter, this court decided whether or not the petitioner had standing to even make a claim under the will of Vera Svoboda. And this court decided that, indeed, he did under the Probate Act, and that the case was remanded to the circuit court to determine paternity to answer the question whether David William Svoboda was the biological father of the petitioner. Judge Stott presided over an evidentiary hearing in November 2012 and issued a final order of heirship on November 30, 2012, by which this appeal was taken. Now, I raised four grounds on appeal, which I state in my brief. The first, contending that there was no showing of clear and convincing evidence to establish paternity in favor of the petitioner, showing David William Svoboda as the father. Second, that the court committed error by finding that the co-executors in this case refused a DNA test. Third, that the court committed error by drawing a negative inference that the co-executors refused a DNA test. And finally, that the court committed error by considering the likeness of the petitioner in viewing a high school yearbook photo of David William Svoboda. Your Honor, the first issue regarding the evidence, it was the petitioner's burden in the underlying matter before the circuit court that showed by clear and convincing evidence that he was the biological son of David William Svoboda. And the courts have defined clear and convincing evidence as the quantum of proof which leaves no reasonable doubt as to the truth of the proposition asserted. In this case, it would be petitioner's burden to show that there's no reasonable doubt that he is the son of David William Svoboda. It's my contention, or my client's contention, that that burden was not met in this case. There's four primary pieces of evidence to support the petitioner's petition. They all revolve around, three of the points revolve around the statements made of Brenda Justice, who's the mother of David William Svoboda, and there's no dispute about that, regarding David being the father. The first occurred in 1967 after she determined that she was pregnant and had to tell her family. She left a message to her sister, Sally Justice, who was also in high school at the time, saying that Brenda and Dave did a bad thing. Brenda was sick for nine months. And this was taken in an evidence deposition submitted to the court, and Sally Justice said that she believed there's no doubt that Brenda meant that David was the father of the child. The second statement is a statement that Brenda Justice made to her other sister, Patricia Fellon, who at the time was Patricia Justice, during a telephone conversation around the same time, in which she said that Brenda told Patricia that she was pregnant and David was the father. The third statement is a statement that, were the statements that Brenda made to the adoption agency, because in this case, after she learned she was pregnant, Brenda was moved to Iowa, and immediately after birth, gave the baby up for adoption. Fourth, a statement that David Savoda made to Sally Justice at a party in 1971. Now, all of this evidence is clouded with doubt. Brenda Justice was 17 years old when these statements were made. Now, there's no evidence that the petitioners offered since Brenda passed away. There's no evidence in this case since 1960, well, actually, 1971, no new evidence. So, the underlying court in this court is relying solely on the evidence deduced from the 1960s, and one statement in 1971. Brenda Justice, again, was a 17-year-old girl who was dating, the record shows, other boys at the time. She had been seen with David Justice, so logically, she would tell her sisters that she was with the person she was seen with and that he would be the father. But there, again, there's evidence taken that, in the record, that she was with other people. Now, what's most telling is the most, I think... Excuse me, you said dating with other people, that she had sexual relations with them? No, there's nothing in the record where she, there's no evidence to prove she had sexual relations with anyone else. And nowhere is there evidence in the record other than what Brenda told other people, that she had sex with David. That is, she'd been seen around town with David, and she'd been seen around town with other boys, but there's no evidence that anyone saw them in any action. Well, or that there were any reports of her having sexual relationships with anyone else. That's correct, and the record does not state that. Okay. The closest thing, I believe, the record has to show what Brenda's actual statements were at the time is through the adoption agency records. And she gave a statement, or at least the adoption agency took down notes of what Brenda said regarding the father. And I believe these documents are telling, she told the adoption agency regarding the alleged father. The statements in the documents show that the only thing we have is the alleged father was a gentleman named David Savota. But she describes, she states David Savota, but by all accounts gives the description of someone else, because, for example, she gave the wrong weight, she gave the wrong eye color, she gave the wrong nationality. And most telling is that she told the adoption agency that David Savota only had a 10th grade education. They were in the same class together, and they both went past the 11th grade together. It wasn't until their senior year that David was suspended for apparently smoking in high school. Excuse me? Smoking. So he did not graduate? He didn't graduate at her. He was suspended for their senior year. He returned the next year, and then he graduated. And so at the time of this birth, he would have completed what? 11th grade, at least the 11th grade. Not 10th? Not 10th. And she listed the father as a carpenter. The evidence produced at trial is clear that David Savota was never a carpenter. So the statement she gives the adoption agency is unclear and inconsistent with the description of David Savota. Sorry, but is your point that she didn't know that she really was trying to mislead the adoption agency, or she was naming him but describing a different person? What is the inference with respect to that? I believe the inference is that there could be more than one person who is the father. She identified David to her sisters, so she identified David to the agency, but gave the physical characteristics of someone else who could be the father. My point is that the petitioner has the burden to show by clear and convincing evidence the paternity here, and that Brenda's statements to the adoption agency are not clear. Moreover, the adoption agency submitted to the Iowa State Department of Health a verification of birth. And the verification of birth lists the mother, and where it says the full name of the father, it lists unknown. Now, at that time, this was submitted by the Lutheran Social Service of Iowa. They would have known that David was identified by Brenda as the alleged father, but given the information she gave them, they went ahead and listed for purposes of informing the State Department of Health that the father was unknown. And indeed, this verification of birth is verified, stating that this is to verify that the above data is correct or true and correct, according to the record on file in this office, listing the father as unknown. Moreover, at the time that the Bronchers, who were the adoptive parents, petitioned the district court in Polk County for adoption, they listed that the father's whereabouts, or the naturalist father's whereabouts, were unknown. And at the time the adoption decree was actually entered, it stated that, and this is a court order, finding that the allegations contained in the petitions are true, and that the father being unknown. The adoption decree, which is an order from the court, further stated that the Polk County Department of Social Welfare had made appropriate inquiry and investigation, as provided by the Code of Iowa. And the Code of Iowa at the time provided that a social worker investigate the conditions and antecedents of the child to determine the appropriate, whether the child was appropriate for adoption. So, I'm confused though. If she states that David Swoboda is the father to the adoption agency, what they do with that information is, I take it out of her control, and you're saying that, what, that they do a thorough investigation and determine somehow that this was not the father, based on what? How do we know? Exactly. So, based on the record, Brenda Swoboda, no, I'm sorry, Brenda Justice, at the time she gave the baby up for adoption, was apparently interviewed, and the adoption agency prepared a history, or a report. And the report shows that the alleged father was David Swoboda, but again, the characteristics are inconsistent with that of David. The adoption agency submitted a verification of birth to the State Department of Health, in which it listed the father as unknown. I don't know if Brenda was involved in this. That's what I'm trying to get at. We have no idea, and we have no idea what really consequence that is, or how they go about determining that, or if they determine that. You're right. I have no way of knowing what independent investigation Lutheran Services did to determine who the true father was, or Brenda's statement about the father was true and correct. And you talk about discrepancies on the characteristics, I guess, of the father. Was there evidence to refute, for example, that he wasn't Bohemian? Was there a nationality given? So, David Swoboda, I'm sorry, Dennis Swoboda is the brother of David, David now being deceased, testified that David was not Bohemian. He didn't say what nationality it was, only to say that the statement is untrue. The other inconsistencies I don't think could be rebutted regarding the education level she reported, or whether he was a carpenter. She would have known that he was not a carpenter. I'm sorry, it couldn't be rebutted? Right, we know that they went through at least the 11th grade together. She, if the petitioner's version is correct, she became pregnant in their senior year. So, they were at least in the 12th grade together. She would have known that. As far as the, and I don't mean, I don't want to confuse the courts, I want to make this clear. Once the child is put for adoption, the petitioner who seeks to adopt the child, the adoptive parents, they independently, they file papers with the court, and they would not have that information from Lutheran Social Services or the adoption agency. So, they file independently. It's at that time of the filing that, under Iowa law, a social worker is assigned to do an investigation of the conditions and antecedents of the child to determine the appropriateness of the adoption. And after that investigation, the court made a finding that the father was unknown. Finally, the, I'm a bit off track here, but it goes to the point that in addition to the documents from Brenda or statements about the identity of the father at the time this occurred, the adoption occurred, or when Brenda gave the biphobia for adoption, David Savota gave a statement, at least the closest thing we have in the record to his statement, when he joined the military. And he was asked to identify the number of children he had, and he listed zero. In the same document, he was also asked to list his relations, and he did not list any children in that document. So, we have the statement of Brenda that she made, contemporary and in some time with the events, to Lutheran Social Services, which I contend are unclear. And number two, we have the statement that David made when he listed his number of children in the military documents. And again, he wrote zero. Now, you mentioned four elements. You're just still on number one? Right. Okay. Well, that's why I was a sidetrack there. Okay. So, those are the statements. I was going through the statements that Brenda made and that David made. As far as the evidence that Brenda made to her sisters, I repeat and restate that those statements are nothing more than those same statements made to Lutheran Social Services, that there's evidence to suggest that there's other men in her life at the time, yet she had to identify someone. She had been seen with David, and therefore, it was a logical conclusion that she would name David. Can I ask you about the DNA testing? Yes. Before we run out of time, was there a petition for that and any determination as to the propriety of that? It seems like it kind of came up during the trial. Yes, sir. It wasn't real clear about it. Yeah. I would like to address that. So, my other three contentions on appeal, two of them aren't intertwined, is the issue of this DNA. At the close of the proceedings, the judge was very interested in getting to the bottom of what the DNA status was. Because that would determine the parentage. I believe so, yeah. So, at the very end, he said, obviously, the elephant in the room is this DNA. And my colleague said we would pay for one, and the judge said, well, that's not for us. The case is closed. The actual transcript, the language is in the pleading. And so there was never a petition for DNA, and nor could there be. Because under the Illinois Parentage Act, there's no right within the act to obtain DNA for paternity purposes from anyone outside the natural lineage of either the parent or child. So, I mean, the issue would never be before the court, nor would the petition in this case have a right to ask for it. So, obviously, I was surprised to see the judge made a finding that my clients rejected one. And number two, it's my position that the judge took a negative inference that there was a rejection. And that stated in the order that your position is. Yeah, that my position is that the judge obviously found persuasive that which he put in the order. And the fact that he says my clients rejected a DNA test. And then, again, we're weighing the scales here to determine whether or not there's clear and convincing evidence. I believe that the judge. They didn't reject one. They just didn't volunteer one. Is that what you mean, the answer is? The judge made a finding that my clients, the co-executors, rejected a DNA test. And, in fact, he just didn't offer one. There was no discussion of that. There was no discussion at trial. Well, there's no right. Right. I understand that. So, as an attorney to get the order from the court finding that my clients rejected one is fundamentally, well, one, I think an error. But unfair for the advocacy because I wouldn't have had a chance to address it. Nor if I did have a chance, it would have been improper. And, finally, I mean, I just say that the issue of likeness is brief. It's very brief. We'll get the opportunity for rebuttal. So I think we're going to have to cut you off at this point. Thank you, Mr. Fowler. Mr. John. Thank you. Thank you. Thank you. Thank you. Please record. Counsel, my name is William John. I practice law in Burlington, Iowa. I'm here today on behalf of our client, Scott Allen Brocher. As Mr. Cowell pointed out, Mr. Brocher filed a petition back in November of 2004 claiming airship in the United States through a pre-deceased biological father, David Williams. This court issued a Rule 23 back in September of 2008, in essence establishing the law of the case, being that if Mr. Brocher could prove that biological relationship, he would be allowed to take under the will of Elvira Spobita as a heir of David Williams Spobita, who had a pre-deceased Elvira. Thus, the trial that occurred in November of 2012 was based entirely on that factual determination. This court deals with those types of determinations all the time, but I think it's important to remember as the facts are reviewed that the trial court, in fact, made a determination that Mr. Brocher is the biological child of David Williams Spobita on appeal. That finding of the trial court is given great deference, and this court, in its appellate review, determines whether or not that finding was against the manifest weight of the evidence. So I acknowledge that the standard of trial was our burden to prove by clear and convincing evidence the facts that we allege. And then on appeal, this court can overturn that if that finding was against the manifest weight of the evidence. As the court on appeal pointed out in Morelli v. Patelli, which we cite in our brief, to be against the manifest weight of the evidence, conclusions opposite to those reached by the trial court must be clearly evident to the court on appeal. I realize this court knows that standard very well. I don't mean to belabor that point, but I think it's important to remember that as we go through several pages of facts. Mr. Cowell mentioned that we rely on four basic facts to support a proposition. Obviously, to dispute that, I think we have many more than four sets of facts to support the petition that's filed in this matter, and we outlined those at length in our appellate brief. I'm not going to be able to reiterate all those today, but I do want to kind of focus on three major areas of facts that I think support an affirmation of the trial court. I'd be happy to take any questions that you have. I think most importantly, all of the siblings of David Williams Fovita and Brenda Justice have provided evidence that supports the trial court's findings. We had offered at trial requests for admissions pursuant to Supreme Court Rule 216 that were served upon the co-executors approximately seven years before trial. Our offer was objected to by the co-executors, and after some colloquy, the court entered Exhibits E and F, which are set forth in our appendix, pages 35 through 40. The first request to produce asked Donald and Dana Fovita if they had personal knowledge regarding the relationship between Brenda Justice and David Williams Fovita back in 1966 and 1967, and whether it led to her pregnancy. They did not answer that. It was thus deemed admitted as our position. The second request asked whether, on the briefing cards, page 36 of the appendix, to admit or deny that Brenda Sue Justice and her brother David Williams Fovita were involved in a relationship in 1966 and or 1967 that resulted in the pregnancy of Brenda Sue Justice during calendar year 1967. Again, that request was not responded to. At page 35, lines 9 through 16 of the record, the trial court admitted the Exhibits E and F over-objection. And also, at page 34 of the record, the court made a moral ruling, lines 15 through 24 of page 34, that those admissions, request for admissions, were deemed admitted because they were not answered. So there was a specific finding, one, that the exhibits were entered as evidence, and two, that those admissions were deemed admitted. I point that out because on appeal, in the original appeal brief of the Co-Executives, those findings and orders of the trial court were not appealed. And pursuant to Rule 341, I believe it's H-7 of the Illinois Supreme Court rules, matters not argued in the appellate brief may not be raised in a reply brief or an oral argument. I believe Mr. Couch did address that issue in his reply brief. It's my position that it was weighed because it was not argued in the appeal brief. I did not have the opportunity to then research it and address it to this court in a substantive brief set. I also believe that's the court, Your Honors, under the case law cited in our brief, pages 34 and 36. There's two or three Illinois cases that we cite to this court. One of them is Tires and Tracks v. Dominick, 331, Illinois Appellate Court Reporter 87, which clearly holds that admissions pursuant to request to admit operates at a judicial admission that is considered incontrovertible and has the effect of withdrawing the fact from detention. So here we have Co-Executives that have admitted that David Svoboda and Brenda Justice had a relationship that resulted in the birth of Brenda's child in 1967. The evidence I believe is incontrovertible is that that boy, baby boy Justice, is now Scott Allen Brosher. So the only factual evidence is the father, David William Svoboda. It's my position that the request for admissions established that in the matter of factual record in this case. The Tires and Tracks case, the other case cited in pages 34 and 36 of our brief, I believe the Co-Executives are bound by that factual admission. Having said that, our position is set forth in the brief. I'm not sure the court has before a justiciable issue based on that admission. Their position is that you went ahead and attempted to prove that fact in court and thereby that nullifies the issue? I understand that argument. Could you address that? I understand that argument, Judge. Mr. Cowell raised that issue at the conclusion of the submission of evidence at the trial. The trial court, at the conclusion of the evidence, made no findings or orders to controvert the orders that I cited to this court earlier in my argument. So my position is the trial court's orders admitting the exhibits and deeming those requests for admissions to be deemed admitted, those two orders were not overturned by the trial court. Those two orders were not vacated as part of the written order. I believe actually, Your Honor, on page 1 of the trial court's written order from December of 2010, I believe the trial court indicated that it considered the evidence, the exhibits, and also the request for admissions interpursuant to Rule 216. And so the trial court made it clear that it was reliant on the request for admissions as part of its order. And again, those orders were not appealed in the original brief. So I understand Mr. Cowell raised the argument at the conclusion of the trial. Nothing was done about it, and that matter is not appealed. So I believe that argument has been waived. I did not have an opportunity to brief it, and I have not thoroughly researched the legal issue. I don't believe it's before this Court. And again, with that, I believe Donald and Daniel Skova have submitted substantial evidence to support the petition submitted as caused. Dennis Skova is the other brother of the deceased David Williams Skova. Dennis testified in trial pursuant to subpoena that he made a phone call to Sally Justice in the summer of 2004. Sally Justice is one of the two surviving sisters of Brenda Justice. And Dennis Skova's testimony is set forth in the record of the transcript from R40 to R43, and I can read all that. But Dennis Skova's testimony was that he did not know Sally Justice in high school, had never talked to her, didn't know her, but for some reason in the summer of 2004, he made the attempt to call Sally Justice to, in his opinion, ascertain whether or not David and Brenda had a child together back in 1967. The testimony of Sally Justice regarding that phone call that Dennis Skova initiated is quite different than that. Sally's testimony was such that David Paul, and I feel like I didn't read a portion of that, Your Honor. At page 25 of Sally Justice's deposition, which is part of the record in this matter, starting at line 15, she talks about that conversation. She says, starting at page 15 on line 25, and we finally talked, and we talked at length, meeting her and Dennis. And Dennis explained to me that he had been at his lawyer's office, and his lawyer was settling for the mom's estate, working through the probate situation, and his lawyer had said, now, did Dave leave any other heirs? And Dennis explained to me, he said, you know, I was walking out of the law office, and I said to my brother, what about that baby that Dave had with Brenda Justice in high school? So he was asking me where this child could be. Question at page 26, line 2. And so Dennis Skova expressed knowledge to you about the baby that Dave Skova and Brenda Justice had together. Is that correct? Answer at line 5, yes. So Sally's recollection of that phone call was that David called, I'm sorry, Dennis called to ask about the location of the baby that David Skova had with Brenda Justice. Somewhat of a different recollection than Dennis Skova testified to at trial. The question then becomes, you know, what is the credibility of Dennis Skova's testimony? Obviously, the trial court was in a better position to ascertain the credibility of Mr. Skova's testimony. In addition, Kirk Meyers testified. He was there by subpoena. And the reason he was there, Dennis Skova testified is he learned about these facts from Kirk Meyers. Kirk Meyers' record shows Dennis thought was a good friend of David Wood Skova. Dennis Skova testified, well, I learned about this conversation from Kirk Meyers many years later, I believe, at a meeting in a bar sometime after 2000. And Kirk Meyers testified specifically at page 92 of their record. He was asked about this conversation he had with Dennis Skova at a bar sometime after 2000. The question posed to Kirk Meyers is the record at page 91, line one. The question to Kirk Meyers, again, my question, sir, is specifically, during your conversation with Dennis Skova in your bar in early 2003, four or five, did you make any statements to Dennis Skova about who may have fathered the child that Brenda Justice had back in 1967? The answer, I did not. As Kirk Meyers testified, he didn't tell Dennis Skova about this child. Dennis' testimony was he didn't know about the child back in 1967. He learned about it from Kirk Meyers. That's why he called Sally Justice, theoretically. The testimony from Dennis' trial in 2012 simply was not credible as found by the trial report. Surprising what occurred, you know, Sally's testimony is accurate. Dennis knew about the child, went to the lawyer. The lawyer said there were more errors out there. Dennis did the right thing, contacted the Justice family, and then for some reason changed the position about why he called. But our position is— He is a co-executor. Dennis is not.  Donald and Daniel are the co-executors. The other two brothers. Dennis is a brother who is not involved in this pollution in the state. He is an interested party in the state. Interested in what respect? As a beneficiary. But he would not take any additional amount of money if we determined that Mr. Broshar is not an heir. That is correct, Judge. So in what way is he interested? The family, who are the co-executors, have disputed our petition from the spot. Donald and Daniel spoke with him. They have contested Mr. Broshar's claim as the heir should. My position is perhaps the family has put some type of leverage upon Dennis Colvin as to convince him to change his test. I don't know that, Judge. That's just my— I would point out, as you raised that motion to dismiss Fyler earlier, neither will Donald or Daniel's share of the estate be affected by Mr. Broshar taking him under the will as a heir of David Williams Colvin. The only heir affected is David— Colvin. Oh, that is correct, Judge. He has not filed an appeal for the decision. That's part of the position. I believe there's not a decisional issue before this Court because Donald and Daniel have no financial interest in the outcome of this matter as far as receiving a benefit under the estate. It's only David and Colvin who have not filed an appeal. That's the subject of our motion to dismiss the rule of law earlier in this matter. I'm not going to readdress that here today unless you want me to. So we have evidence from Donald and Daniel Svoboda and from Dennis Svoboda that supports the petition filed by Mr. Broshar. We have, I believe, more than the two statements referred to by Mr. Cowell from the two sisters of Brenda Justice. Both Sally and Patricia Justice—Patricia is now Patricia Phelan— If I could, I'd like to turn to the evidence from the adoption records. Mr. Cowell discussed earlier the Exhibit 1 that is cited in Mr. Cowell's brief indicates that somehow Brenda Justice misidentified David Williams Svoboda. Again, I'm not quite sure what the implication is that Brenda had the wrong person or if it was more than one David Williams Svoboda from Pettersville, Illinois, for the 1960 time period. But at Svoboda Exhibit 1, which is part of the Lupern Social Services record, on pages 1 and 2, on the second page, David Svoboda's name is spelled correctly. On the first page, it is spelled incorrectly. I acknowledge that. There's a transposing of the last two letters. That's my position. And on the first page, in addition to the eye color and Mr. Svoboda's weight, there's other information provided about him. It says he's from Pettersville, Illinois, which I believe is uncontested, that he was 18 years old, which I believe is uncontested, that he was 5 feet 10 inches tall, had blonde hair, had deep complexion, slender build, medical history unknown, no apparent problems, and that he was a Catholic. I don't believe those factual characteristics are true. Again, my position is set forth in a brief. A 17 or 18-year-old young girl may have someone's weight wrong. I'm not sure I can identify green eyes versus hazel eyes and make the distinction very easily. Mr. Svoboda's weight is listed as being 150 pounds in his military records, and those were submitted, I believe, in October of 1960. And I apologize. Brenda lists it as 150 pounds in the adoption records. He's listed as 125 pounds in his military records almost a year and some months later. Again, I'm not sure that's a huge difference, but Brenda identified a singular alleged father. On page 2, it describes David Svoboda as the alleged father. There's no information provided in the report that other men may be potential fugitive fathers. I don't know what the practices were back in 1967, but now questions are posed to young ladies and young women about whether your contacts with other men may leave other people out there as possible fathers. That is not discussed here. There may be other individuals. I'm going to kind of switch gears here a minute, because I want to touch on two things that the court noted in its order about the DNA testing and what I think the judge called the likeness of the high school photograph. Is it your opinion that it was appropriate to consider those two pieces of evidence, or is it your opinion that the court did not consider those two pieces of evidence in coming to its conclusion? As to the DNA evidence, Your Honor, the colloquy between the court and myself is part of the record. I don't want you all to read that, but the court did pose the question. You made the statement. My research prior to trial indicated that we had no authority to make a motion with the court to compel DNA testing, and so I could not request a trial court order to obligate members of the family to submit to that. As to your question of whether it was appropriate or not, it probably was not a judge. It's probably not an appropriate thing to ask about, or to use as part of the ruling against these co-executors. Having said that, I do want to back up a second. There was also a conversation about whether or not the co-executors consented to or refused the request to have DNA tested. I put forth in our brief what my recollection was of the events of that day. It was sort of an awkward conversation between myself and the court and opposing counsel, but at the conclusion of that conversation, the recollection was people looked to the counsel for the co-executor and for David Fulton Svoboda, and there was no response, meaning they didn't have any verbal input. Whether there was a nonverbal or negative implication, I'm not going to state that. I don't want to say what happened or didn't happen in that regard, but it was a long pause and not much happened as far as their consenting or not consenting to the test. But having said that, we cite in our brief statements by counsel can bind their clients, and again, I don't want to get into discussion between counsel before trial because it's not part of the record. But the court did what it did. Our position, judges, there's no prejudicial error shown. When the court appeals, it looks at the admission of evidence. The party against whom that evidence was submitted has to show substantial prejudice that materially affected the outcome of the trial. And I don't believe that's been shown. The evidence provided by all of the siblings, from David and Brenda, and from the evidence provided by Brenda to the Lutheran Social Services Tribe, that David Svoboda was the singular left father, there was a great body of evidence to support the trial court's order, irrespective of what it said or didn't say about the defense. As to the issue of the physical likeness between Scott Roescher and David Svoboda, that was evidence submitted by the co-executives. They moved to introduce the picture from the Edwardsville High School yearbook. We did not. Do you think it was appropriate for the court to consider that? There was a case, Your Honor, we cite in our brief, and I have it fresh in my mind, but there was a case that said when there's evidence that's otherwise submitted, then looked to for another purpose, there's nothing inappropriate about that. I can't cite that specific case, Judge, but given the fact that the exhibit was offered without objection, received by the court, I believe the court then has the authority to do with it what it wants, so to speak, in making that reference to the physical likeness. Thank you, Mr. Powell. Mr. Powell, you have rebuttal. I would address the points that Mr. Johns made in the order that he made them, and first being that as it relates to the weight of the evidence, whether Daniel Svoboda and Don Svoboda admitted to the paternity of David William Svoboda, just to be clear, the request to admit was issued in 2005 before I was involved, and there was no movement on the petition aside from summary judgment based on the request to admit or anything like that. At the beginning of trial, I made an argument that the court should not admit them as a judicial admission, and the court denied my argument. It rejected it. So they were admitted. Well, it's a judicial admission. I mean, it's not evidence. It's a judicial admission. Well, it is evidence. Well, it's evidence in the form of a judicial admission. Right. Yeah. So once the court said that it rejected my argument that they should be denied or put aside, the court went ahead and heard evidence from Petitioner on those material points. Once the court heard evidence on those material points from Petitioner, the Petitioner then waives the right to rely on those points for purposes of the findings. At the end of the trial, I told the judge that since the Petitioner has put on evidence on those points raised in the request to admit, then the court must make its decision on the evidence adduced at trial rather than on any request to admit. The court, in its final order, finding earship, made its decision on the merits of the case, not on the – you'll see no reference in the order on the request to admit. Therefore, the court made its decision based on the merits and not on the request to admit, which were waived by Petitioner. I think now Petitioner is saying that I'm not waiving the claim of waiver because I didn't raise any error on that point in my opening brief. I'd only say that I'm appealing the decision of the court on the merits. Since there was no error made in the court on the final order regarding the decision on the request to admit, I had nothing to appeal in that respect. Since the court followed the law, heard the case and the merits, based on the evidence adduced at trial, I'm only appealing those decisions on the merits, consistent with his decision, to make a decision on the merits rather than on any request to admit, which was waived by Petitioner by adducing evidence. So that's my position, and I respect your honor. Number two, the attorney, Mr. Johns, made a point. So we can put Daniel and Donald aside because they both testified at trial that they had no knowledge that David Williams Savota was the father. So then Petitioner says, well, Dennis Savota, the other brother, says that he knew about the baby. Dennis Savota testified that he did not know about the baby and that he heard about it from a friend of his, Kirk Myers, at a bar. At trial, Kirk Myers denied having a conversation or recalling that conversation. Dennis recalled it. But as I said in my brief, that conversation revolved around these unusual circumstances regarding the life of Brenda Justice because shortly after she gave birth to Petitioner, she had another baby, which is counsel, and then disappeared. So the context of that conversation between Dennis and Kirk would explain why Kirk may not necessarily remember telling Dennis about a baby when their conversation was about the death of Brenda. But Dennis, nevertheless, denies that he had knowledge of any baby, and therefore that issue is a dispute. Okay, but Dennis did not deny that he had this conversation with Kirk Myers, and Kirk Myers told him that they had a baby. There was this belief that David and Brenda may have had a baby. Okay, not proof, but that there was at least the rumor out there that they had a baby. And Dennis denies the conversation that my colleague recited through the deposition of Sally Patricia Fellon. And one other thing about this standard. I'm sorry, I missed that. My colleague recited the evidence deposition of Patricia in which she recounts a conversation with Dennis in which Dennis says, you know, we left the attorney's office and I turned to my brother and said, hey, what about that baby? That's what Patricia says Dennis said. But there's no dispute that Dennis was the one that kind of initiated the inquiry. That's true, that's true. I'm only saying that Dennis denied the conversation with his brothers outside the law office and that his source of knowledge came from this gentleman, Kirk Myers, and then because of that conversation caused him to call Patricia. Thank you. It's a very interesting case, and we have the briefs and the records, and thank you for your briefs and arguments, and we'll take the matter under advisory.